# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

NO. 03-14-00412-CV

---

R. Z., a/k/a R. L., a/k/a R. G., Appellant

v.

Texas Department of Family and Protective Services, Appellee

---

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
NO. D-1-FM-13-001602, HONORABLE TIM SULAK, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

R.Z. appeals the trial court's judgment terminating her parental rights to her child, N.Z., following a jury trial.[1] *See* Tex. Fam. Code § 161.001. In six points of error, she challenges the admission of an exhibit, the sufficiency of the evidence to support the trial court's findings based on the jury verdict, and the appointment of appellee Texas Department of Family and Protective Services as the sole managing conservator of her child. For the reasons that follow, we affirm.

## BACKGROUND

R.Z.'s child N.Z. was born on June 3, 2011, in Pennsylvania. R.Z. and her child left Pennsylvania when N.Z. was about four months old and went to Florida for approximately 6 months,

---

[1] We use initials to refer to appellant and her child. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8. The trial court also terminated the parental rights of J.R., N.Z.'s father, in the judgment, but J.R. did not appear for the trial and has not appealed.

prior to coming to Texas. After coming to Texas, they lived with family, including R.Z.'s father and her sister.

The Department became involved with R.Z. and N.Z. in 2012. Among other incidents, the Department received a referral of domestic violence in November 2012. R.Z. had been arrested for assault family violence. The Department also received referrals in December 2012 and January 2013, and the referrals included allegations of criminal activity, illegal drug use, and abuse of N.Z. R.Z. was arrested at the beginning of February 2013 for resisting arrest and for a warrant stemming from assault family violence charges and spent a few days in jail. While she was in jail, a Department caseworker met with R.Z. Around this time, R.Z. authorized her mother to be in charge of N.Z.'s care. R.Z., however, resumed care of N.Z. at some point prior to March 21, 2013.

On March 21, 2013, R.Z. and N.Z. were staying in an apartment with R.Z.'s sister and her sister's boyfriend. In response to a 911 call of a small child "wandering around by himself," a police officer went to the apartment complex and found N.Z. by himself in the parking lot near a busy intersection. According to the officer, N.Z. "was soaking wet with urine, had no pants on, and his shirt was filthy dirty with mud, and he was playing with a stray dog." Around 30 minutes after finding the child, the officer was able to locate the apartment in which the child was staying and to speak with R.Z. According to R.Z., she and her sister left N.Z. in her sister's boyfriend's care to run errands and N.Z. was asleep when they left.

A caseworker for the Department also was called to the apartment at that time. The caseworker asked R.Z. to do a drug test based on the way R.Z. was acting, believing "that she could possibly be on something." The caseworker reported that R.Z. was "constant[ly] moving up and

2

down, shaking, . . . just yelling and screaming for no reason." The caseworker tried to get R.Z. to do an oral drug test, but she chewed through the first swab and then claimed that she had "cotton mouth" as to the second swab so she did not provide a valid sample to test.

As a result of the March 2013 incident, the Department removed N.Z. from R.Z.'s care and placed N.Z. in foster care. The Department filed a petition for termination of parental rights, and the Department was named the temporary managing conservator of N.Z. R.Z. was ordered to submit to random drug testing and participate in a psychosocial evaluation, individual therapy, and basic parenting classes. During the pendency of the case, R.Z. tested positive for amphetamine, methamphetamine, and cocaine, missed drug tests requested by the Department, and was arrested and faced pending criminal charges. R.Z. was involved in physical altercations with her father in August 2013 and her boyfriend in November 2013, both resulting in police involvement. R.Z. was arrested for assault family violence and interference with an emergency call for the incident in November 2013, but her father did not press charges as to the August 2013 incident. As to visits with N.Z. and court-ordered services during the pendency of the case, R.Z. attended supervised visits with N.Z. and participated in some of the services, but she also missed visits and failed to complete the court-ordered services by the time of trial.

The trial occurred in June 2014 because the dismissal date for the case was extended. At trial, the witnesses included R.Z., police officers who responded to incidents involving R.Z., a laboratory director who worked for the drug testing facility that tested specimens provided by R.Z. and her mother, the CASA supervisor assigned to this case, Department employees, an occupational therapist who worked with N.Z., a therapist who worked with R.Z., and the foster parents. R.Z.

3

testified about the various allegations and incidents involving the police and the Department during the time leading up to the Department's removal of N.Z. through trial and to her plans going forward. Her plan was to stay with family in Texas temporarily and then to move to Pennsylvania to live with her mother. It was undisputed that R.Z. loved N.Z., that she had maintained a relationship with him, and that she had participated in services, but that she had not completed the services. She explained that she lacked transportation. She also denied using illegal drugs and explained the positive drug tests as either a mistake by the laboratory or because of diet pills or allergy medicine that she had taken.

The police officers testified about incidents involving R.Z., including the March 2013 incident, the alleged assaults by R.Z. that occurred in August and November 2013, as well as a criminal trespass warning at a hotel in January 2013, alleged misdemeanor theft in August 2013 for "pawn[ing]" her father's sunglasses, and failure to identify in April 2014. The officer who testified about the August 2013 incident involving assault was dispatched to investigate a physical altercation between R.Z. and her father. The officer testified that the allegation was that R.Z. committed aggravated assault with injury to her father and that she "had threatened to kill him" but that no charges were pending because her father decided not to press charges. The officer who testified about the altercation between R.Z. and her boyfriend in November 2013 testified that R.Z. was arrested for assault family violence and interference with an emergency call. The officer testified that the boyfriend had a visible bite mark.

Department employees testified about their involvement and observations of R.Z. and N.Z., R.Z.'s progress toward completing services, and N.Z.'s care and placements in foster care.

N.Z. had been living with his current foster parents for about a year at the time of trial. The foster parents testified that they wanted to adopt him and that N.Z. was doing well in their home. The CASA supervisor testified about her observations of N.Z. in his current placement, and she recommended that R.Z.'s parental rights be terminated, explaining her reasons for the recommendation. In her opinion, N.Z. was a "very happy child" with his foster family and seemed "to have a very close bond with everyone" in his current placement and she expressed concern about R.Z.'s denial of drug abuse and lack of treatment and the safety of the environment if N.Z. was returned to his mother.

The exhibits included the results of the drug testing during the pendency of the case on R.Z. and her mother, reports to the court from CASA and the Department, records from a crisis center and from counseling and psychological services, and copies of the misdemeanor complaint against R.Z. concerning the alleged theft in August 2013, a capias for her arrest dated May 16, 2014, and a warrant recall dated June 11, 2014. Laboratory reports show that R.Z. tested positive for drugs in April 2013, December 2013, and February 2014, and her mother tested positive in December 2013. The intake records from the crisis center, dated January 27, 2013, show that R.Z. reported that her father physically and verbally abused her and that he abused alcohol daily.

The jury found that R.Z.'s parental rights should be terminated based on subsections (D), (E), and (O) of section 161.001(1) of the Family Code and its finding that termination of R.Z.'s parental rights was in the child's best interest. *See id.* § 161.001(1)(D), (E), (O), (2). The trial court rendered judgment on the jury's verdict. R.Z. filed a motion for new trial, which was denied. This appeal followed.

## ANALYSIS

**Admission of Exhibit**

In her first point of error, R.Z. contends that the trial court erred in overruling her objection to the admittance of one of the Department's exhibits. The challenged exhibit was a printout of pages from a website called "Naughty Reviews." The pages have pictures of R.Z. but identify her as "Natalia" and as a "Female Escort in Austin Texas." The contact information includes a phone number with an area code from the Pennsylvania area, an email address, and cost of services. R.Z. contends that the exhibit was not properly authenticated, *see* Tex. R. Evid. 901(a), and that the prejudice caused by the exhibit outweighed its probative value. *See* Tex. R. Evid. 403. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *See In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005). A trial court abuses its discretion when it acts without regard to any guiding rules or principles. *Downer v. Aquamarine Operators*, Inc., 701 S.W.2d 238, 241–42 (Tex. 1985).

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Tex. R. Evid. 901(a); *In re J.P.B.*, 180 S.W.3d at 575; *see In re J.A.S.*, No. 11-09-00176-CV, 2011 Tex. App. LEXIS 345, at *7–8 (Tex. App.—Eastland Jan. 13, 2011, no pet.) (mem. op.) ("Testimony that a photograph is what it purports to be is sufficient to authenticate the photograph, while the accuracy of that testimony is a question for the factfinder."); *see also* Tex. R. Evid. 401 (defining relevant evidence), 402 (explaining that relevant evidence generally admissible).

To support her position that the exhibit was not properly authenticated, R.Z. focuses on information on the website that was not accurate, such as her height. At trial, she testified that she was not aware of the website before the trial, that she had nothing to do with it, that she has never used the phone number that was listed, and that someone must have created the profile on the website to humiliate her. R.Z., however, did not dispute that the pages were posted on the website, that the photographs on the website were of her, or that the email address on the website was her e-mail. A Department caseworker also testified that the phone number on the website matched the contact number that the Department was provided for R.Z. for several months, and R.Z. admitted to using the name "Natalia" on a Facebook account that she created. Printouts from that Facebook account were admitted as an exhibit without objection. Given this evidence, the trial court could have concluded that there was sufficient evidence to support a finding that the pages from the website were what the Department purported them to be and, therefore, the trial court did not abuse its discretion by overruling R.Z.'s objection to the evidence based on lack of authentication. *See* Tex. R. Evid. 901(a).

R.Z. also contends that the trial court abused its discretion because the trial court should have excluded the exhibit under Rule 403. *See* Tex. R. Evid. 403. Rule 403 provides that relevant evidence "may be excluded if its probative value is *substantially* outweighed by the danger of unfair prejudice." *Id*. (emphasis added). "Because the best interest of the child must be the court's primary consideration in a suit affecting the parent-child relationship, rule 403 is an extraordinary remedy that must be used sparingly." *In re J.W.*, 113 S.W.3d 605, 612 (Tex.

7

App.—Dallas 2003, pet. denied); *see Trevino v. Texas Dep't of Protective and Regulatory Servs.*, 893 S.W.2d 243, 248 (Tex. App.—Austin 1995, no writ).

To support her position that the exhibit should have been excluded under Rule 403, R.Z. contends that the Department improperly characterized the website at trial as "an offer for prostitution" and "an escort service" and focuses on the nature of the photos, showing her "in scantily clad clothes." The evidence from the website, however, was relevant to the determination of whether allowing R.Z. to retain her parental rights would be in her child's best interest. *See Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976) (including, among other factors to be considered, emotional and physical danger to the child now and in the future, plans for the child by the individual or agency seeking custody, and acts or omissions by parent showing that parent-child relationship not proper). Guided by the principle that Rule 403 is an extraordinary remedy in the context of evidence relevant to a best interest finding, we conclude that the trial court was within its discretion when it overruled R.Z.'s objection to the evidence and overrule R.Z.'s first point of error. *See In re J.W.*, 113 S.W.3d at 612.

**Sufficiency of the Evidence Challenges**

In her second through fifth points of error, R.Z. challenges the legal and factual sufficiency of the evidence to support the trial court's findings based on the jury's verdict.

*Burden of Proof and Standard of Review*

To terminate parental rights, the Department has the burden to prove one of the predicate grounds in section 161.001(1) of the Family Code and that termination is in the best

interest of the child. *See* Tex. Fam. Code § 161.001(1), (2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The applicable standard of proof is the clear and convincing standard. Tex. Fam. Code § 161.206(a); *see In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002) (due process requires clear and convincing standard of proof in parental termination cases). The clear and convincing standard is "'that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002) (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)); *see also* Tex. Fam. Code § 101.007 (defining "clear and convincing evidence").

Legal sufficiency review of the evidence to support a termination finding requires a court to "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266. In reviewing the factual sufficiency of the evidence to support a termination finding, an appellate court reviews the record to determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d at 25; *see also In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (describing factual sufficiency review in context of termination finding and noting that appellate court "must give due deference to a jury's factfindings" and "not supplant the jury's judgment with its own judgment").

*Statutory Predicate Grounds*

In her second through fourth points of error, R.Z. challenges the legal and factual sufficiency of the evidence to support the trial court's findings based on the jury's verdict as to the

statutory grounds submitted to the jury. Three statutory grounds were submitted to the jury. *See* Tex. Fam. Code § 161.001(1) (D), (E), (O). Because termination of a parent's rights can stand on one statutory ground plus a best interest finding, we limit our review to the evidence to support subsection (E)—that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of their child." *See id.* § 161.001(1)(E); *In re A.V.*, 113 S.W.3d at 362 (explaining that only one predicate ground necessary to support termination of parental rights when there is also best interest finding).[2]

"'Endanger' means 'to expose to loss or injury; to jeopardize.'" *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (quoting *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.* The relevant inquiry under section 161.001(1)(E) is whether evidence exists that the endangerment of the child's well-being was "the direct result of Appellant's conduct, including acts, omissions, or failures to act." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied) (citation omitted). "Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *Id.*

---

[2] R.Z. alternatively requests that, if this Court finds the evidence insufficient as to subsections (D) or (E) but affirms on other grounds, this Court modify the judgment to reflect its findings as to those subsections. We decline to do so. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (declining to reach other issues raised by parent).

To support her position that the evidence was insufficient to support a finding under subsection (E), R.Z. focuses on her testimony at trial that she left N.Z. in her sister's boyfriend's care on March 21, 2013, the day that N.Z. was by himself in the parking lot. Other evidence, however, supported a finding that she voluntarily left her young child unsupervised. There was evidence to support a finding that the boyfriend was already at work when R.Z. and her sister left the apartment.[3] Although R.Z. urges that a misunderstanding or mis-communication with her sister's boyfriend does not equate to endangering a child, the jury could have resolved the conflicting evidence to conclude that R.Z. voluntarily left her child at the apartment unsupervised.

R.Z. also urges that the relevant time period to determine whether there is evidence of endangerment was the time period before the Department removed N.Z. But evidence of her conduct both before and after the removal is relevant to the endangerment determination under subsection (E). *See Pruitt v. Texas Dep't of Family & Protective Servs*., No. 03-10-00089-CV, 2010 Tex. App. LEXIS 10272, at *13–14 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.) (noting that relevant evidence to endangerment determination "may include conduct before the child's birth and both before and after the child has been removed by the Department"); *see also Robinson v. Texas Dep't of Protective & Regulatory Servs.*, 89 S.W.3d 679, 686-87 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (parent's illegal drug activity after agreeing not to commit such acts in plan for reunification "established clear and convincing proof of the parent's voluntary, deliberate, and conscious conduct that endangered the well-being of her children").

---

[3] According to the Department's report to the court, the boyfriend did not recall being asked to watch N.Z. on that day, he had never watched N.Z. in the past, and R.Z. and N.Z. had been at his place for one day.

Here, the jury could have credited the evidence of illegal drug use, domestic violence, and criminal activity by R.Z. both before and after N.Z. was removed to find that R.Z. engaged in a conscious course of conduct that endangered her child. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."); *In re M.E.-M.N.*, 342 S.W.3d at 263 ("A parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, supports a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being."); *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ("Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment."); *In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.) ("[I]ntentional criminal activity which exposed the parent to incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well being of the child." (citation omitted)).

R.Z. denied or did not remember altercations that she had with family members, denied using illegal drugs after N.Z. was born, provided excuses, including lack of transportation, for missing visits, court-ordered services, and requested drug screening, and presented evidence to support findings that the drug testing facility made a mistake or that she tested positive because of diet pills and allergy medicine. She presented evidence of a negative drug test that had overlapping time periods with a positive drug test. The jury, however, could have credited the evidence of positive drug tests that did not overlap with the negative test and the evidence that R.Z. engaged in other criminal activity, including assault on multiple occasions. The exhibits included the results

12

of drug tests showing that R.Z. tested positive for drugs in April 2013, December 2013, and February 2014. Although some drug tests were negative, the laboratory director for the testing facility provided an explanation for why the drug tests with overlapping time periods could have different results and confirmed that other drug tests showed that R.Z. had ingested methamphetamine during the pendency of this case.

R.Z. also had pending criminal charges against her at the time of trial, and she missed drug tests requested by the Department during the pendency of the case. *See In re J.O.A.*, 283 S.W.3d at 346 (considering missed drug tests and other conduct after children removed in endangerment determination under subsection (E)); *In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("A factfinder reasonably could infer that [parent's] failure to submit to the court-ordered drug screening indicated she was avoiding testing because she was using drugs."); *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) (same).

Viewing the evidence in the light most favorable to the endangerment finding under subsection (E), we conclude that the jury could have formed a firm belief or conviction that R.Z. "engaged in conduct . . . which endanger[ed] the physical or emotional well-being of the child." *See* Tex. Fam. Code § 160.001(1)(E); *In re J.F.C.*, 96 S.W.3d at 266. Further, based on our review of the record, we conclude that the evidence is such that the jury reasonably could have formed a firm belief or conviction about the truth of the State's endangerment allegations against R.Z. *See In re C.H.*, 89 S.W.3d at 25. Thus, we conclude that the evidence was legally and factually sufficient to support the trial court's finding under section 161.001(1)(E) based on the jury verdict, overrule

13

R.Z.'s third point of error, and decline to address her second and fourth points of error. *See In re A.V.*, 113 S.W.3d at 362.

*Best Interest Finding*

In her fifth point of error, R.Z. challenges the legal and factual sufficiency of the evidence to support the trial court's finding based on the jury verdict that termination of her parental rights was in the best interest of her child. *See* Tex. Fam. Code § 161.001(2).

Factors that courts consider in assessing the best interest of a child include: (i) desires of the child, (ii) the stability of the home or proposed placement, (iii) parental abilities, (iv) the emotional and physical needs of the child now and in the future, (v) the emotional and physical danger to the child now and in the future, (vi) the plans for the child by the individual or agency seeking custody, (vii) the programs available to assist these individuals to promote the best interest of the child, (viii) acts or omissions by the parent showing that the parent-child relationship was not proper, and (ix) any excuses for the parent's conduct. *Holley*, 544 S.W.2d at 372; *see also* Tex. Fam. Code § 263.307 (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment"). No one factor is controlling, and evidence presented to satisfy the predicate ground finding may also be probative of the child's best interest. *In re C.H.*, 89 S.W.3d at 28; *Pruitt,* 2010 Tex. App. LEXIS 10272, at *22–23.

R.Z. contends that the evidence showed that she was bonded and loved her child, that N.Z.'s needs were being met when he was living with her, and that she can parent N.Z. and provide

14

him a safe home. R.Z. focuses on her plan to move to Pennsylvania to live with her mother if N.Z. is returned to her and evidence showing that N.Z. was a happy, healthy child before the Department removed him from her care. Evidence supported findings that R.Z. and the child loved each other and that R.Z. had made progress on her parental abilities. There also was evidence that supported findings that R.Z. was appropriate with N.Z. during supervised visits and that R.Z. with her family's help had been able to take care of N.Z. prior to the removal.

Other evidence, however, demonstrated that R.Z. was unable to take care of her child or to provide him with a stable home. *See In re T.G.R.-M.*, 404 S.W.3d 7, 17 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ("Stability is important in a child's emotional and physical development."). Evidence supported findings that R.Z. used illegal drugs during the pendency of the case and engaged in criminal conduct, including committing assault, and that she did not have a stable living arrangement or income. *See id.* ("Without stability, income, or a home, [a parent] is unable to provide for the child's emotional and physical needs." (quoting *In re C.A.J.*, 122 S.W.3d 888, 894 (Tex. App.—Fort Worth 2003, no pet.))).

At the time of trial, R.Z. was living with family temporarily, lacked transportation and income, and faced criminal charges including assault and resisting arrest. She and her mother also had testified positive for drugs, and she missed drug tests requested by the Department. As late as April 2014, evidence showed that R.Z. was arrested after police were dispatched to a bank because her sister was trying to pass a stolen check. R.Z. did not give her actual name to the police and was arrested for failure to identify. As to her plans for N.Z., R.Z. testified that, if N.Z. was returned to her, she planned to live temporarily in Texas and then to move back to Pennsylvania to live with her

mother. R.Z. testified, "My plan is to continue being a mother of my son, like I was before he got taken away." As to this plan, the jury could have credited, among other evidence, the evidence of the March 2013 incident and R.Z.'s conduct leading up to that incident to conclude that this plan—returning the child to his situation before the removal—would not be safe or in the best interest of the child.

If R.Z.'s parental rights were terminated, the Department's plan was for the foster parents to adopt him. The evidence showed that the child was safe and well taken care of in the foster parent's home, that he had been in that placement for about a year, that he had bonded with his foster family, and that development delays that he had when he entered foster care had improved significantly. Both of the foster parents testified that they loved N.Z. and hoped to adopt him, and evidence showed that they treated him appropriately. An occupational therapist who observed and worked with N.Z. testified that initially he was "banging" his head and hitting others around him, that he was "delayed overall in typical child activities," and that he was a different child several months later.

We must assume that the jury resolved evidentiary conflicts in favor of its verdict if it was reasonable to do so. *See In re J.P.B.*, 180 S.W.3d at 574 (noting that within province of jury to judge witness's demeanor and to disbelieve testimony). Given that R.Z.'s testimony was inconsistent and conflicted with evidence from other witnesses, we conclude that it was reasonable for the jury to resolve the conflicts against R.Z. and in favor of the verdict. For example, R.Z.'s testimony that she came to Texas to visit conflicted with evidence showing that she came to start a new life, her testimony that she left N.Z. in the boyfriend's care on the day N.Z. was removed

16

conflicted with evidence that the boyfriend was already at work when she left the apartment, and her testimony that she did not use illegal drugs conflicted with the positive test results on multiple occasions.

Viewing the evidence in the light most favorable to the best interest findings, we conclude that the jury could have formed a firm belief or conviction that terminating the parental rights of R.Z. was in the best interest of the child. *See* Tex. Fam. Code § 160.001(2); *In re J.F.C.*, 96 S.W.3d at 266. Further, based on our review of the record, we conclude that the evidence is such that the jury reasonably could have formed a firm belief or conviction that termination of the parental rights of R.Z. was in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 25. Thus, we conclude that the evidence was legally and factually sufficient to support the best interest finding. We overrule R.Z.'s fifth point of error.

**Appointment of Department as Managing Conservator**

In her sixth point of error, R.Z. argues that the trial court erred and abused its discretion by appointing the Department as sole managing conservator of N.Z. This point of error is based on her other points of error challenging the termination of her parental rights. Given that we have concluded that the evidence was legally and factually sufficient and that the trial court did not abuse its discretion by admitting the challenged exhibit, we overrule R.Z.'s sixth point of error. *See* Tex. Fam. Code § 161.207 (requiring court to appoint managing conservator for child if parental rights terminated and authorizing Department as one of choices); *In re D.N.C.*, 252 S.W.3d 317, 319 (Tex. 2008) (per curiam) (noting that parent's "challenge to the conservatorship appointment was subsumed in her appeal of the parental-rights termination order").

**CONCLUSION**

Having overruled R.Z.'s dispositive points of error, we affirm the trial court's judgment.

_____

Melissa Goodwin, Justice

Before Chief Justice Jones, Justices Rose and Goodwin

Affirmed

Filed:   October 29, 2014